Joseph QUINN, et al.

v.

CITY OF BOSTON and Boston Chapter of the N.A.A.C.P., Intervenor.

No. Civ.A.01–CV–10598–RG.

United States District Court, D. Massachusetts.

May 17, 2002.

Harold L. Lichten, Pyle, Rome, Litchen & Ehrenberg, P.C., Boston, MA, for Joseph E. Quinn, Sean O'Brien, Joseph Sullivan, plaintiffs.

Susan M. Weise, City of Boston Law Department, Boston, MA, for Thomas Menino, Dennis A. DiMarzio, defendants.

Susan M. Weise, Eve Piemonte Stacey, David J. Breen, Assistant Corporation Counsel, City of Boston Law Department, Boston, MA, for City of Boston, defendant.

Toni G. Wolfman, Foley, Hoag & Eliot, Boston, MA, Nadine Cohen, Lawyers Committee for Civil Rights, Under Law of the Boston Bar Association, Boston, MA, for NAACP, intervenor-defendant.

## MEMORANDUM AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

STEARNS, District Judge.

On April 11, 2001, plaintiffs Joseph Quinn, Sean O'Brien, Robert Dillon, and Joseph Sullivan filed this Complaint against the City of Boston alleging that they had been denied jobs as entry level firefighters in violation of the Fourteenth Amendment of the United States Constitution and the federal and state Civil Rights Acts (Counts I–III).[1] Plaintiffs maintain that the City discriminated against them by giving hiring preferences to minority candidates who had lower test scores on the state firefighter's examination. The City, supported by intervenor Boston Chapter, NAACP, argues that its hiring decisions were in conformity with the terms of a consent decree (the *Beecher* decree),[2] entered in *Boston Chapter, NAACP, Inc. v. Beecher*, 371 F.Supp. 507 (D.Mass.1974), *aff'd*, 504 F.2d 1017 (1st Cir.1974). Plaintiffs also allege that the City violated G.L. c. 151B, § 4(16), by requiring them to take medical examinations without first extending bona fide conditional job offers (Count V).[3]

On October 25, 2001, plaintiffs filed a motion seeking summary judgment on all counts of the Complaint, and a preliminary injunction ordering their immediate instatement, or in the alternative, forbidding the City from filling at least five firefighter vacancies until this lawsuit is resolved. On January 11, 2002, the City of Boston and

---

1. On November 14, 2001, the court allowed plaintiffs to file a Third Amended Complaint adding Roger Kendrick, Jr., as a fifth plaintiff.

2. I will refer to the decree in the singular, although several subsequent decrees were entered to effectuate the terms of the original decree.

3. This same claim also figures in a count alleging a violation of the Rehabilitation Act (Count IV) and a count apparently alleging a violation the Americans with Disabilities Act (Count VI). At the hearing, the court agreed to render an expedited decision on Counts I–III given the Boston Fire Department's intention to shortly hire a new class of entry level firefighters.

the NAACP filed cross motions for summary judgment.[4] On April 12, 2002, the court heard oral argument.

*The History of the Beecher Decree.*

The *Beecher* decree has a long history. In 1974, Judge Freedman ruled that the Fire Fighter Entrance Examination used by the Massachusetts Division of Civil Service to screen candidate firefighters had historically discriminated against black and hispanic applicants. Judge Freedman ordered that any future examination be validated under EEOC guidelines, and that preferential hiring procedures be introduced to rectify the effects of past discrimination. *Boston Chapter, NAACP, Inc. v. Beecher*, 371 F.Supp. at 521. The entry of the *Beecher* decree followed. The decree, which applies statewide to all cities and towns subject to the Civil Service law with a minority population of 1% or more, requires the Director of the Division of Civil Service to compile and certify separate lists of minority and non-minority candidates ranked according to their civil service test scores and any statutory preferences.[5] Depending on the city or town, candidate consideration is alternated between the competing lists.[6] The *Beecher* decree prescribes only the order of review. It does not mandate the hiring of any specific number of minorities. If, however, an applicant (minority or non-minority) is passed over, the appointing authority must give a written explanation for its decision to do so.

The decree is to remain in force until the percentage of black and hispanic firefighters in a covered department equals the percentage of blacks and hispanics in the local community. Once a city or town achieves this equivalence, defined as parity, the decree is lifted. Since the decree was imposed, all but twelve of the affected cities and towns have reached parity. The firefighter's exam, however, has never been "validated in accordance with the 'Guidelines on Employees Selection Procedures' issued by the [EEOC]," as Judge Freedman and the litigants had contemplated.

In September of 1974, the Court of Appeals affirmed Judge Freedman's decision and upheld the decree. *See Boston Chapter, NAACP, Inc. v. Beecher*, 504 F.2d 1017, (1st Cir.1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975). In so ruling, the Court rejected defendants' argument that the decree was constitutionally infirm.

> Defendants contend that the color-conscious relief imposed by the district court is unconstitutional. The argument is without merit. The relief goes no further than to eliminate the lingering effects of previous practices that bore more heavily than was warranted on minorities.

*Id.* at 1027.

> The decree [will remain] in force, for each local fire department, until that department attains sufficient minority fire fighters to have a percentage on the force approximately equal to the percentage of minorities in the locality.

*Id.* at 1026–1027.

In 1991, the decree was again challenged. In *Mackin v. City of Boston*, 1991

---

4. The City's motion seeks summary judgment on all counts of the Complaint. The NAACP's motion seeks summary judgment only on the reverse discrimination claims. (Counts I–III).

5. Statutory preferences are granted to veterans, residents and children of deceased public safety officers.

6. The Cities of Boston and Springfield are required to review minority candidates on a 1 to 1 basis. The other towns and cities covered by the decree are required to do so on a 1 to 3 basis.

WL 349619 (D.Mass. Jun 21, 1991) (Civil Action No. 89-2025-S), a group of aspiring white firefighters sued the City of Boston, making arguments virtually identical to those made here. Judge Skinner ruled for the City on all of plaintiffs' claims.

In *Mackin v. City of Boston,* 969 F.2d 1273 (1st Cir.1992), *cert. denied,* 506 U.S. 1078, 113 S.Ct. 1043, 122 L.Ed.2d 352 (1993), the Court of Appeals affirmed Judge Skinner. The Court held that the decree passed the strict scrutiny test of *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 494, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), because it had been narrowly tailored to its purpose and was self-limiting in duration.

The appellants also hawk the idea that, even if the goals of the *Beecher* decree have not yet been accomplished, the decree is constitutionally infirm because it sweeps too broadly. This argument is by no means a new one. Over 15 years ago, we found the decree to be narrowly tailored toward the achievement of its legitimate objectives. See *Beecher,* 504 F.2d at 1027 (judging the decree to be "carefully limited in extent and duration"). To be sure, in the intervening years the tests for determining whether remedial race-conscious relief is, in fact, narrowly tailored have been refined and clarified. See, e.g., [*U.S. v.*] *Paradise,* 480 U.S. [149], 177–79, 107 S.Ct. [1053], 1069–71, [94 L.Ed.2d 203] (plurality opinion); *Stuart,* 951 F.2d at 453–55. But, that process of refinement and clarification does nothing to call the adequacy of the instant decree into serious question....

In assessing an overbreadth challenge to an order directing race-conscious relief in the context of public employment, a court should consider, *inter alia,* the extent to which (i) the beneficiaries of the order are specially advantaged, (ii) the legitimate expectancies of others are frustrated or encumbered, (iii) the order interferes with other valid state or local policies, and (iv) the order contains (or fails to contain) built-in mechanisms which will, if time and events warrant, shrink its scope and limit its duration. The *Beecher* decree passes this test with flying colors.

In this case, only *qualified* minority candidates are specially advantaged; no minority candidate is placed on the eligibility list unless he or she has attained a passing score on the entrance examination. This is an important indicium of narrow tailoring. See *Stuart,* 951 F.2d at 454. Relatedly, the decree does not require that minority aspirants be appointed, nor does it dispense with the statutory preferences mandated by state law. Thus, the decree gives only a limited advantage, not a guarantee of employment, to minority applicants. This, too, is a significant factor. See *Johnson v. Transportation Agency,* 480 U.S. 616, 638, 107 S.Ct. 1442, 1455, 94 L.Ed.2d 615 (1987) (approving affirmative action plan because, among other things, rather than mandating quota hiring, it "merely authorize[d] that consideration be given to affirmative action concerns when evaluating qualified applicants"). As a result of these features, it can appropriately be said that the Beecher decree "is not being used simply to achieve and maintain racial balance, but rather as a benchmark against which the court could gauge ... efforts to remedy past discrimination." *Local 28, Sheet Metal Workers' Int'l Ass'n v. EEOC,* 478 U.S. 421, 477–78, 106 S.Ct. 3019, 3051, 92 L.Ed.2d 344 (1986) (plurality opinion)....

Finally, the decree's life is limited, remaining in force only until its requirements have been met. See *Beecher,* 371 F.Supp. at 523 (providing for release

from appointment process mandated by the decree "[a]s a city or town achieves a complement of minorities commensurate with the percentage of minorities within the community"). Limitations of this sort are crucial factors in deflecting overbreadth challenges. See *Stuart*, 951 F.2d at 454. Indeed, the proof of the present pudding is that, since 1974, more than fifty percent of the communities originally affected by the decree have already been freed from further oversight.

Mindful of these realities, we conclude that the Beecher decree is tailored with sufficient precision to withstand the appellants' imprecations.

*Mackin*, 969 F.2d at 1277–278. The Court also rejected plaintiffs' argument that the City had achieved parity and that the decree therefore, even if constitutional, no longer applied. The Court noted that plaintiffs had calculated parity by comparing the percentage of black and hispanic firefighters in the department ranks to the percentage of blacks and hispanics in the Boston population at the time that the *Beecher* decree was entered. The Court held that the decree required that the comparison be made to the City's current minority population. In so ruling, the Court stated:

First, the relevant language of the decree is most naturally read as referring to contemporaneous population figures: "As a city or town achieves a complement of minorities commensurate with the percentage of minorities within the community, certification will be made according to existing Massachusetts law." *Beecher*, 371 F.Supp. at 523. Had the district court and the existing parties intended to embody in the decree a stipulation that a community would be released from the prescribed procedures upon reaching a complement

of minorities commensurate with the percentage of minorities within the community in 1974, we feel confident that the decree would have said so.

Second, the undisputed evidence concerning practice under the decree indicates beyond hope of contradiction that applications for the release of municipalities from the decree's burdens have universally been guided by reference to contemporaneous population statistics. Few things evidence a decree's meaning more persuasively than an immutable, decade-old pattern of past practice under the decree, consensually engaged in by all sides in the underlying litigation that produced the decree.

*Mackin*, 969 F.2d at 1276.

*The Cross Motions for Summary Judgment*

■ In their motion for summary judgment, plaintiffs renew the argument that the now twenty-eight year old decree has outlived its constitutional shelf-life. They also revive the *Mackin* plaintiffs' argument that parity has been achieved by the City of Boston, although they give this argument a new statistical twist. Plaintiffs first contend that the decree's very longevity is proof that it can no longer be deemed narrowly tailored to its purpose and is therefore overbroad. The First Circuit, however, in *Mackin*, 969 F.2d at 1276, rejected this same argument, despite the fact that the decree had then been in place for eighteen years. The Court also observed that:

To the extent that the plaintiffs here are seeking relaxation of one or more consent decrees . . . it must be remembered that "a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants a revision of the decree." *Rufo [v. Inmates of Suffolk County Jail]*, [502 U.S. 357,] 112 S.Ct.

[748], 760, [116 L.Ed.2d 867]. That party "may meet its initial burden by showing either a significant change in factual conditions or in law." *Id.*

As in *Mackin,* the only significant factual change the present plaintiffs point to is the passage of time.[7] The number of years that a decree is in place, while relevant, does not define the decree's constitutionality where its expiration date, even if not fixed, is functionally related to the attainment of the decree's intended remedy.[8] As the Court of Appeals noted, "the [*Beecher*] decree's life is limited, remaining in force only until its requirements have been met.... Limitations of this sort are crucial factors in deflecting overbreadth challenges.... Indeed, the proof of the present pudding is that, since 1974, more than fifty percent of the communities originally affected by the decree have already been freed from further oversight." *Mackin,* 969 F.2d at 1278.[9] While plaintiffs express understandable impatience with the City's preternaturally slow progress towards compliance, attaining the goals of the decree is no less a compelling interest today than it was when *Mackin* was decided.[10] *See Wessmann v. Gittens,* 160 F.3d 790, 795 (1st Cir.1998).

Plaintiffs' more intriguing argument is that the City of Boston has in fact reached parity.[11] To demonstrate this, plaintiffs use a different statistical method than the one used in the *Beecher* decree. The *Beecher* decree measures compliance by comparing the percentage of blacks and hispanics in the Boston Fire Department to the current percentage of blacks and hispanics in the City's population. The plaintiffs argue that the proper formula should compare the percentage of black and hispanic firefighters to the percentage of blacks and hispanics in the Boston population who are age nineteen or older. (Age nineteen is the minimum age of employment for a firefighter). According to plaintiffs' formula, the relevant percentage of black and hispanic firefighters in the Boston Fire Department is 40%, while the percentage of blacks and hispanics nineteen years or older in the general population is 32.6%. By contrast, the *Beecher*-

---

7. Plaintiffs also suggest that the law has significantly changed. In some respects it has, although not in any consistent way that raises questions about the constitutional foundations of the *Beecher* decree itself. For example, plaintiffs' citation to *Boston Police Superior Officers Federation v. Boston,* 147 F.3d 13, 18 (1st Cir.1998) actually supports the defendants' contention that the intent of a consent decree trumps newly raised concerns as to how to contract or expand the decree's reach.

8. *Mackin* instructs district courts to be open-minded when addressing requests for the dissolution or relaxation of institutional decrees and to be particularly sensitive to federalism concerns. Nonetheless, "[i]n the context of civil rights litigation, a central consideration in determining whether to dissolve structural remedies is whether the agency in question has come into compliance with constitutional requirements. Put another way, an inquiring court should ask whether the goals of the litigation, as incorporated in the outstanding decree, have been completely achieved." *Mackin,* 969 F.2d at 1275.

9. According to the intervenor, only twelve of the fifty-seven departments originally falling under the decree are presently subject to its mandates (Boston among them).

10. As discussed below, unlike the dilemma of the tortoise and the hare, the prospects of the City reaching parity in the foreseeable future are imminently real.

11. Plaintiffs also make the argument that the *Beecher* decree should no longer apply to the City because the City violated the decree by failing to develop a validated firefighter's exam. Apart from the obvious, that it is the State and not the City that is responsible for developing such an exam, it would make no sense to "punish" the City's failure to abide by the decree by invalidating the decree's authority.

*Mackin* formula used by defendants yields a department minority population of 31.5% and an overall Boston minority population of 38.26%.

■ The reason why plaintiffs and defendants disagree over the percentage of minorities in the Department itself is because plaintiffs derive their figure by comparing the number of black and hispanic firefighters with the pool of entry level firefighters. The defendants' *Beecher–Mackin* formula, on the other hand, compares minority firefighters with the population of the Department as a whole. Because of the relative small number of minorities in command positions, the entry level comparison yields a larger percentage of minority firefighters.[12]

The plaintiffs argue that their approach is the correct one because the decree itself deals only with entry level positions. The City and the NAACP argue in response that the decree was designed to eradicate the distortions created by racial bias in the make up of the Department as a whole, on the assumption that minorities would eventually qualify for command positions if given access to the service ranks. By this logic, the goal of the decree, which is to increase the representation of minorities at all levels of the Department, requires the use of the department-wide statistics.[13]

■ The City and the NAACP also argue that there is no justification for changing the historical measure of parity on which communities affected by the decree have relied for three decades, *see Mackin*, 969 F.2d at 1276, and that even if there were, there are preferable alternatives to the plaintiffs' formula.[14] Defendants argue that the population pool that best predicts the recruitment of Boston firefighters is that of adult service or bluecollar workers. Using that pool, the percentage of potential minority recruits in Boston is 55%, as opposed to 38.26% if the *Beecher–Mackin* formula is used, or 32.6% according to the plaintiffs' formula.[15]

The defendants' most compelling argument is that the Court in *Mackin* endorsed the *Beecher* formula without any hint that it considered it suspect or unsound.[16] This is not to say that plaintiffs' proposed formula is implausible, foolish or lacking in integrity. Indeed, were I writing on a

12. In *Beecher*, the Court of Appeals stated that "[t]he decree [would] remain[ ] in force, for each local fire department, until that department attains sufficient minority fire fighters to have a percentage on the force approximately equal to the percentage of minorities in the locality." *Beecher*, 504 F.2d at 1026–1027. It is undisputed that parity was calculated by the *Beecher* litigants by comparing the percentage of minority firefighters in the entire Department against the number of minorities in Boston's general population. Similarly, in *Mackin*, the Court of Appeals accepted statistics based on the *Beecher* formula.

13. Plaintiffs acknowledge the force of this argument at page 8 of their brief where they point out they will not be eligible for appointment to higher level positions in the Department "without prior experience in the entry-level position of fire-fighter."

14. The City argues that because the decree applies throughout Massachusetts, the straightforward *Beecher–Mackin* formula better accommodates the disparate communities under the decree's jurisdiction.

15. The NAACP argues that if the court is to redesign the decree's parity formula, other refinements should be made as well. For example, the NAACP points out that the 2000 census has a new category for persons designating themselves as bi-racial or multi-racial. If this category is included in the calculation of the minority population, the gross percentage of Boston's minority population increases to 39%.

16. While the idea of an upper age cap was mentioned in *Mackin* opinion, the Court held that plaintiffs had raised the issue too late in the litigation to be considered.

blank slate, I would find much in it to recommend. The original *Beecher* litigants might·have thought so too, had they anticipated the rapidity with which Boston's minority population would grow the life of the decree. Nonetheless, given three decades of precedent under a practice twice examined, and twice approved by the Appeals Court, I am constrained by stare decisis to deny plaintiffs' motion for summary judgment. Because there is no dispute that the City of Boston is in compliance with the *Beecher* decree as promulgated, the City's cross motion for summary judgment on Counts I–III of the Complaint will be allowed.

### ORDER

For the foregoing reasons, plaintiffs' motion for summary judgment is *DENIED* as to Counts I–III. Plaintiffs' motion for a preliminary injunction is *DENIED*. The City of Boston's cross motion for summary judgment is *ALLOWED* as to Counts I–III. The intervenor's motion for summary judgment on Counts I–III is *MOOT*. The court further orders that separate and final judgment be entered as to its disposition of Counts I–III on the express determination that the interests of justice so require.

SO ORDERED.